HAWKEYE GOLD DREDGING CO., Limited, v. STATE BANK OF IOWA FALLS.

(Circuit Court, N. D. Iowa, Cedar Rapids Division.   November 23, 1907.)

No. 37.

**1. EQUITY—JURISDICTION—LEGAL OR EQUITABLE REMEDY.**
    The remedy of a corporation to recover from a bank money deposited therein in the name of the treasurer of the corporation, who was also president of the bank, and alleged to have been wrongfully transferred by him to the bank by means of his checks as treasurer, and converted by the bank, is in equity and not at law, the legal title to the deposit being in the treasurer and not in the corporation.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 153-155.

    Obtaining possession or establishing title to personal property in equity, see note to Jones v. MacKenzie, 58 C. C. A. 101.]

**2. SAME—OBJECTION TO JURISDICTION—WAIVER.**
    Where the subject-matter of a suit is of equitable cognizance, a court of equity will not dismiss the suit on the ground that there may also be a remedy at law, unless the objection is made by defendant before entering on its defense.

    [Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 173-176.]

3. CORPORATIONS—POWERS—UNAUTHORIZED ACTS OF OFFICERS.

Where the memorandum of association of a Canadian corporation, which under the law was binding upon the corporation when executed, authorized it to incur and pay certain liabilities including those for property acquired either before or after the incorporation, the corporation had power and was obligated to pay the purchase price of property acquired by its promoters before incorporation, which was transferred to and accepted by it, and it has no equity to recover payments so made by one of its officers, although they were made irregularly and without express authority from its board of directors.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 12, Corporations, §§ 1789–1792.]

4. ACCOUNT—TRANSACTIONS WITH BANK.

Transactions between a mining corporation and a bank considered, and the account stated between them.

In Equity. On final hearing.

The complainant, a corporation of British Columbia, seeks an accounting and the recovery of money deposited for it with the defendant bank in the name of "H. C. Miller, Tr. H. G. D. Co., Lt'd," which money it is alleged belonged to complainant; that defendant so well knew, but has wrongfully converted the same to its own use by applying it without rightful authority to the credit of Byron B. Bliss upon his account and overdraft in said bank, and refuses to account for or pay the same to complainant upon its demand therefor. Defendant, among other defenses, denies being indebted to complainant in any sum whatever, and avers that it has paid in full all moneys deposited with it to the credit of said account, upon checks duly drawn by complainant and its treasurer; and by amendment to its answer filed just before the hearing it challenges the jurisdiction of the court upon the ground that complainant's remedy, if it has any, is at law.

From the testimony, which is voluminous and much of it quite confusing, it appears that in 1904 Byron B. Bliss, Samuel Calvin, George L. Dobson, Lewis W. Lansing, George T. Hedges, and other residents of Iowa, and John Mulholland of the town of Lillooet in the Province of British Columbia, Canada, organized the complainant as a corporation under the laws of said province. Calvin, Bliss, Mulholland, and R. D. George were the owners of a mining lease embracing some five miles of the bed of the Fraser river near Lillooet in said province, and the purposes of the corporation as stated in its memorandum of association are, among others, to sell the shares of its capital stock, and acquire by purchase, lease, or otherwise said Fraser river mining property and other rights and privileges and pay for the same, and to work, develop, sell, or otherwise deal with such properties. The organization of the company was completed May 19, 1904, and it was then authorized to commence business. The memorandum of association also provides that the business of the company may be transacted at any place in the British dominions, or in the United States as the company may determine. The persons above named and others, including H. C. Miller, were selected as the first board of directors of the company in June, 1904, and Professor Calvin and Mr. Bliss were selected by the board as president and secretary, respectively, and Mr. Miller as treasurer. Mr. Bliss resided at the city of Iowa Falls in this state, and an office or place of business of the company was established at that place and he there acted as its principal officer and manager. The defendant is a banking corporation, organized under the laws of Iowa, located and doing business at said city of Iowa Falls. H. C. Miller was a director of the bank, and its president and managing officer from 1894 to August 1, 1904, when he retired from the position of president and manager. B. H. Thomas was then elected vice president, and afterwards had the general management of the bank's affairs. Bliss made contracts for the sale by complainant of large amounts of its capital stock and received the pay therefor prior to its completed organization and agreed to pay commissions to others for effecting such sales, and continued to make such sales, receive pay therefor, and pay such commissions and other expenses and obligations of the company until sometime in Septem-

ber, 1904, when it was discovered, or thought by other officers and shareholders of complainant, that he was not properly accounting for the money so received by him. The money of the complainant so received by Bliss was deposited from time to time in the defendant bank in the name of "H. C. Miller, Tr. H. G. D. Co., Lt'd," and the account is so designated upon the books of the bank. It is conceded that the letters following the name of Miller stand for "Treasurer Hawkeye Gold Dredging Company, Limited." Bliss kept an individual account with the bank, and his practice was to pay all of the expenses and other obligations incurred by or for complainant by his own checks upon the bank in favor of the person to whom the obligation was due, which checks were paid by the bank and charged to the account of Bliss therewith. The checks of Bliss for the amounts so paid by the bank were for payments upon the purchase price of the Fraser river property, which was later transferred to complainant, for commissions on sale of its capital stock, for expenses of incorporation, and other expenses and obligations of complainant. Bliss would reimburse himself for these payments by warrants drawn by him as secretary of the company upon its treasurer payable to himself individually, which warrants show the purpose for which they were made. These warrants were made and delivered to Miller from time to time, who then made his check as treasurer upon the bank in favor of Bliss for the amount thereof, and as president of the bank charged the check, or directed it to be charged to his account as treasurer and credited to that of Bliss with the bank. Miller and others of the directors of complainant knew and fully understood this practice of Bliss and acquiesced therein. Bliss also made other warrants upon the treasurer in favor of himself, upon which Miller also made his checks as treasurer, which in like manner were charged to his account as such and credited to that of Bliss. But such warrants do not show for what they were made, and it does not appear that they were made to reimburse Bliss for any payments made for complainant or for its benefit in any way.

Meetings of the shareholders and directors of the company were held in complainant's office in Iowa Falls August 30, 1904, and the day before such meetings the bank, upon request of Miller or some one for complainant, made up a passbook, showing the condition of the Miller account as treasurer with the bank, and delivered it to Miller. Omitting an item of $1,000 which appears upon both sides of this account, and which does not affect the true condition thereof, the passbook shows that the account was opened April 8, 1904, and from that time to and including August 29th there was deposited with the bank to the credit of this account a large number of deposits,

aggregating, .................................. $64,742 25

August 29th there was also placed to its credit an item of..................................... 16,077 65

                                                ————————— $80,819 90

(The item of $16,077.65 will be again referred to in the opinion.)

There is charged to the account nine checks, signed, "H. C. Miller, Tr. H. G. D. Co., Lt'd," and entered in the passbook, as follows:

1904.

| | | | | |
|---|---|---|---|---|
| April 9th | (Check No.) 1 | ...............$4,000 00 | | |
| April 20th | " 2 | ............... 7,000 00 | | |
| May 25th | " 3 | ............... 7,699 19 | | |
| June 6th | " 4 | ............... 7,174 46 | | |
| July 7th | " 5 | ............... 2,500 00 | | |
| July 7th | " 6 | ............... 5,000 00 | | |
| Aug. 3rd | " 7 | ............... 1,407 38 | | |
| Aug. 6th | " 8 | ............... 1,800 00 | | |
| Aug. 13th | " 9 | ............... 500 00 | $37,081 03 | |
| Four other items aggregating | | ................... | 1,504 00 | |
| Balance | | ...................... | 42,234 87 | |
| | | | ————————— | $80,819 90 |

—which balance is carried forward to the credit of the account.

The checks numbered 1 to 9, inclusive, are based upon warrants so made by Bliss, are payable to his order, and were charged by Miller as president of

the bank, or under his direction to the Miller account as treasurer, and credited to that of Bliss with the bank. The four items, aggregating $1,504, the complainant concedes are proper charges against it, and they need not be further noticed. Notwithstanding such credits to Bliss, his account with the bank was largely overdrawn from and after April 8, 1904. Miller assisted in making up this passbook, and left the book and canceled checks with Bliss, or in the office of the company in Iowa Falls, which was in charge of Bliss, on August 29th, and they were there at the time of the meetings of the shareholders and directors on August 30th. September 24, 1904, the passbook was again made up and balanced by the bank as follows:

Deposits.

1904.

| | | | |
|---|---|---:|---:|
| Aug. 29th Balance | | $42,234 87 | |
| Sept. 16 | | 300 00 | $42,534 87 |

Checks.

| | | | |
|---|---|---:|---:|
| Sept. 14th | " | 16,077 65 | |
| Sept. 16 to 23, checks aggregating | | 13,327 15 | |
| Sept. 24th Balance | | 13,130 07 | $42,534 87 |

—which balance is carried forward to the credit of the account.

September 24th the board of directors of complainant passed a resolution removing Mr. Bliss and Mr. Miller from the office of secretary and treasurer, respectively, and appointing George T. Hedges as secretary and treasurer, and directing that checks be drawn upon the bank by the president, and attested by the secretary and treasurer, for $13,130.07 and $16,077.65, and immediately presented for payment. Notice of this resolution was given to the bank, and checks for said amounts were at once made pursuant to said resolution, and duly presented for payment on September 24th. The one for $13,130.07 was paid, but the one for $16,077.65 the bank refused to pay.

December 3, 1904, complainant commenced an action at law in this court against the defendant to recover the amount of said check of $16,077.65. April 4, 1905, it filed an amended and substituted petition in said action setting out the entire Miller account with the defendant bank, crediting it with said check of $13,130.07 only, and demanding judgment for the balance. The defendant answered, and in November, 1905, said action came to trial. At the close of the testimony the complainant dismissed the action without prejudice, and on December 9th commenced this suit alleging that it was the equitable owner of all the money deposited with the bank in the name of H. C. Miller, Tr. H. G. D. Co., Lt'd, and praying that it recover the entire amount of said deposits less the amount of said check for $13,130.07. Other facts will be stated in the course of the opinion.

Crissman & Sargent, Dawley & Wheeler, and Albrook & Lundy, for complainant.

F. M. Williams, Healy & Healy, Thos. D. Healy, and Carr, Hewett, Parker & Wright, for defendant.

REED, District Judge (after stating the facts as above). Most of the testimony is that taken in the trial of the law action and used upon this hearing by agreement, and only the ultimate facts shown thereby and deemed material to a determination of the questions presented have been or will be stated.

By an amendment to its answer, filed upon the eve of the hearing, and after the testimony was concluded, the defendant objects to the jurisdiction of the court upon the ground that complainant's remedy, if any exists, is at law. But the remedy at law that will exclude the jurisdiction of equity must be as full, complete, and efficient to the ends of justice as the remedy in equity. The bill alleges in substance that complainant's money was deposited in the defendant bank in the

name of complainant's treasurer, that such treasurer was also the president and manager of the bank, and that through his wrongful acts he made checks for a large amount against his account as treasurer in favor of Byron B. Bliss, and then as president of the bank charged such checks to his account as treasurer and credited them to the account and overdraft of Bliss in the bank, well knowing that the money so credited to Bliss was in fact complainant's, that the bank thus wrongfully converted complainant's money so held by its treasurer to its own use, and the prayer is that complainant be decreed to be the equitable owner of the money so deposited in the name of its treasurer, that the application of said money by the bank to the credit of Bliss in his account with it be not allowed, and that the bank respond to complainant for the amount of such deposits. The complainant's money having been thus deposited in the bank in the name of Miller, treasurer, the legal title to the deposit was in him, and the company could not maintain an action at law against the bank for the recovery thereof, especially as checks had been drawn against the account in the same name in which the deposit was made, which checks the bank had charged to the treasurer's account and credited to that of Bliss. National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693.

In that case the general agent of an insurance company deposited money of the company in the bank in his own name as general agent, the account being designated upon the books of the bank as follows:

"Dr.                   Central National Bank in account with
                       A. H. Dillon, General Agent,                    Cr."

There was a large balance in the bank to the credit of the agent in this account. The agent also had an individual account with the bank which had become largely overdrawn, and the bank sought to offset this overdraft against the amount so due him as agent. The insurance company brought suit in equity to recover the balance so standing to the credit of its agent. The bank challenged the jurisdiction of the court upon the ground that the company's remedy, if any existed, was at law. In holding this objection to be not well taken the Supreme Court said:

"It is objected that the remedy of the complainant below, if any existed, is at law, and not in equity. But the contract created by the dealings in a bank account is between the depositor and bank alone, without reference to the beneficial ownership of the moneys deposited. No one can sue at law for a breach of that contract, except the parties to it. There was no privity created by it, even upon the facts of the present case, as we have found them, between the bank and the insurance company. The latter would not have been liable to the bank for an overdraft by Dillon, as was decided by this court in National Bank v. Insurance Company, 103 U. S. 783, 26 L. Ed. 459; and, conversely, for the balance due from the bank, no action at law upon the account could be maintained by the insurance company."

That case is not distinguishable from this except that in this the treasurer, who was also the president and manager of the bank, had made his checks as treasurer upon the bank for the purpose of transferring the money to the credit of Bliss upon his overdraft, and so consented to such transfer, while in that case the agent did not assent to the appropriation by the bank of the funds of the insurance com-

157 F.—17

pany. But this difference only shows more clearly, if anything, the equitable jurisdiction of the court, for it is well settled that equity will afford relief to the real owner of property from its wrongful or fraudulent transfer by trustees or others holding the legal title thereto in a fiduciary capacity to one having knowledge of the trust character of the property. Oliver v. Piatt, 3 How. 333–400, 11 L. Ed. 622; Clews v. Jamison, 182 U. S. 461, 21 Sup. Ct. 845, 45 L. Ed. 1183.

The bill in this case alleges that the money deposited in the bank in the name of Miller, treasurer, etc., was in fact complainant's and held by him in trust for it; that the bank so well knew and with such knowledge fraudulently applied it by means of Miller's checks as treasurer to the credit of Bliss upon his indebtedness to the bank; that no money was actually paid by the bank upon such checks; and that their only purpose was to transfer the money of complainant from the account of its treasurer to the credit of Bliss in the bank. That the matters so alleged, if true, are grounds for relief in equity seems clear. Insurance Co. v. Bank, 104 U. S. 54, 26 L. Ed. 693; Union Stockyards Bank v. Gillespie, 137 U. S. 411, 11 Sup. Ct. 118, 34 L. Ed. 724.

But if defendant deemed the complainant's remedy, if any existed, complete at law, it should have challenged the jurisdiction upon that ground before entering upon its defense; and not having done so the court will proceed to a decree without stopping to inquire if there might not also be a remedy at law, the subject-matter as alleged being of equitable cognizance. Kilbourn v. Sunderland, 130 U. S. 505–514, 9 Sup. Ct. 594, 32 L. Ed. 1005; Tyler v. Savage, 143 U. S. 79–95, 97, 12 Sup. Ct. 340, 36 L. Ed. 82. The objections to the jurisdiction are therefore deemed to be untenable.

The testimony of Mr. Bliss has not been taken for the reason as stated by counsel that he is under guardianship for some mental disability and is incapable of giving it. The cause has therefore been submitted and must be determined without his testimony. The amount deposited with the bank to the credit of Miller as treasurer is not questioned, nor is it disputed that the deposits so made in fact belonged to complainant. Against his account as treasurer Miller drew the checks numbered 1 to 9, inclusive, as entered in the passbook, aggregating $37,081.03, which complainant contends are not properly chargeable to its funds. These checks were drawn by Miller in favor of Bliss upon warrants upon the treasurer of complainant issued by Bliss as secretary to himself individually. For convenience of reference these warrants may be classified as follows: (1) Those which show the purpose for which they were issued; (2) those which do not so show. Checks Nos. 3, 4, 7, and 9, aggregating $16,781.03, are for warrants of the first class, one of which warrants is as follows:

"$4,000.                                          Iowa Falls, Iowa, 6/6, 1904.

"Hawkeye Gold Dredging Company, Limited.

"Treasurer of the Hawkeye Gold Dredging Company, Limited: Pay to B. B. Bliss ——— or order Four Thousand Dollars. On account of check No. 11,478 to Samuel Calvin.

"By order of the Board of Directors.

"No. 40.                                          B. B. Bliss, Secy."

The other warrants of this class vary only in date, amount, and description of the checks of Bliss, or other purpose for which made.   This class of warrants was issued to reimburse Bliss for his individual checks drawn upon and paid by the bank for the purchase price of the Fraser river property, and for various other obligations and expenses of complainant as testified by Miller, and by Mrs. Hamilton, the chief clerk of Bliss and bookkeeper of complainant, who drew all of these warrants under the direction of Bliss, some of which obligations were incurred before the incorporation of complainant.   It is not disputed by complainant that the bank in good faith paid all of these amounts for Bliss, and that such payments increased his overdraft in the bank; and it satisfactorily appears that the overdraft as it stood August 29th will be increased to the extent of these checks of Miller to Bliss if they are not to remain credited thereon.   Complainant does not dispute that these obligations were so paid by Bliss and the bank or that it has had the benefit thereof, but its contention is that it is not liable for the expenses incurred or obligations contracted by its promoters before the incorporation—citing Cook on Corporations, § 707 (2d Ed.) and note, Winters v. Hub Mining Co. (C. C.) 57 Fed. 287, and other cases; that Bliss as secretary could not rightly draw warrants for the obligations incurred after its incorporation except upon orders or resolutions of its board of directors, which do not appear to have been made; and that its treasurer could not rightly draw his checks in payment of any of such warrants and credit them to Bliss upon his overdraft in the bank, because he, Miller, knew that this fund deposited in his name belonged to complainant and could not be applied to pay the individual overdraft of Bliss in the bank, unless properly authorized by complainant.   It may be conceded that the manner in which Bliss effected the payment of these obligations was irregular, and that it should have been done only upon the order of complainant's board of directors; but it was not morally wrong or fraudulent to reimburse Bliss or the bank for all of these payments, for complainant's memorandum of association provides that the objects for which it is established are, among others:

"(bb) To procure subscriptions for the company's capital and to pay brokerage, commission and other expenses in connection with such subscription."

"(qq) To remunerate any person or company for services rendered, or to be rendered, in placing or assisting to place or guaranteeing the placing of any of the shares in the company's capital, or any debentures or other securities of the company or in or about the formation or promotion of the company or the conduct of its business, and to repay to any person or persons, or body or bodies corporate, any moneys advanced or paid or liabilities incurred in connection with such formation or promotion of such company or the conduct of its business, or for the purpose of the acquisition of any property, real or personal whatever, for or for the benefit of such company, whether such moneys were advanced or paid or such liabilities incurred or property acquired before or after the incorporation of the company, and whether or not such property was acquired by the company, and also to accept, take over, purchase or otherwise acquire in the name of the company any such property.

"(rr) To do all or any of the above things either alone, or in connection with others, and either as principal or agent and either by itself or any subcontractors, agents, or otherwise, and either in the Province of British Columbia, the Dominion of Canada, the United States of America, or elsewhere in British Dominions, or as may be determined by the company."

And the British Columbia's Companies Act under which complainant is organized, and which is in evidence, provides:

"Sec. 4. Associations of persons for the acquisition of gain by any lawful means within the scope of this act may be formed according to the provisions of this act, and any such company, the members, shareholders, and stockholders thereof, shall be subject to the conditions and liabilities, and be entitled to the rights and privileges imposed and conferred by this act."

"Sec. 14. The memorandum of association shall be signed by each subscriber in the presence of, and be attested by, one witness at the least. It shall, when registered, bind the company and the members thereof to the same extent as if each member had subscribed his name and affixed his seal thereto, and there were in the memorandum contained on the part of himself, his heirs, executors, and administrators, a covenant to observe all the conditions of such memorandum, subject to the provisions of this act."

The payment of all of these obligations contracted either before or after the incorporation of complainant is therefore clearly within the purposes and objects of the corporation, and it is liable therefor under its charter. In the authorities relied upon by complainant there was obviously no such charter provisions. It may also be conceded that the bank, through Miller as its president and managing director, was chargeable with notice that the money deposited to the credit of Miller as treasurer was the money of complainant and could not rightly be appropriated by the bank to pay the individual overdraft of Bliss, unless authorized by complainant. But the fact remains that the bank paid all of these checks of Bliss in good faith, and the complainant's obligations have been discharged and those of Bliss to the bank increased to the extent of such payments. The payments were therefore in fact for the benefit of complainant, and it would be grossly inequitable to permit it to accept and retain such benefits and repudiate the warrants of its secretary and managing officer and the checks of its treasurer drawn to reimburse Bliss and the bank therefor. The complainant seeks relief in a court of equity; but, acting upon the maxim that "he who seeks equity must do equity," courts will refuse to enforce a naked legal right, when to do so would be manifestly unconscionable, or the party demanding the same makes no offer on his part to do that which the plainest principles of justice require. Neblett v. McFarland, 92 U. S. 101, 23 L. Ed. 471; Kagy v. Independent District, 117 Iowa, 694, 89 N. W. 972; Batelle v. Northwestern Cement Co., 37 Minn. 89, 33 N. W. 327; Paxton Cattle Co. v. First National Bank, 21 Neb. 621, 33 N. W. 271, 59 Am. Rep. 852; Bell's Gap. R. R. Co. v. Christy, 79 Pa. 54, 21 Am. Rep. 39–41; Low v. Railroad Co., 45 N. H. 375; and see Whitney v. Wyman, 101 U. S. 392, 25 L. Ed. 1050. It does not appear that Bliss is indebted to complainant otherwise than for these checks, and others to be hereinafter mentioned, issued to him by Miller, against which it might be entitled to offset its indebtedness or obligation to Bliss on account of such payments. No injury, therefore, can result to it if these checks are permitted to stand charged to the account of its treasurer and credited to that of Bliss, while the bank will suffer to the amount thereof if this is not permitted.

But checks Nos. 1, 2, 5, 6, and 8, aggregating $20,300, stand upon a different basis. These checks were drawn upon warrants of the second class above mentioned, one of which is as follows:

"4,000.00                                     Iowa Falls, Iowa, 4/9, 1904.

"Hawkeye Gold Dredging Company, Limited.

Treasurer of the Hawkeye Gold Dredging Co., Limited: Pay to B. B. Bliss ———— or order Four Thousand Dollars.  On account of ————.

"By order of the Board of Directors.

"No. 96.                                          B. B. Bliss, Secy."

These warrants do not show for what they were drawn, except that the one for $7,000, upon which check No. 2 was made, recites that it is on account of "error in depositing with treasurer."  Mrs. Hamilton says that none of these warrants was to reimburse Bliss for any payments made on account of or for complainant.  As to the one of $7,-000, she says that Mr. Lansing bought $3,000 worth of complainant's capital stock, and she bought $1,000 worth from Bliss, and the $4,000 paid by them therefor went to the credit of Miller's account as treasurer in the bank; that a Mr. Otterback had bought $3,000 worth of the stock of the Iowa Lillooet Gold Mining Company, another mining corporation of which Bliss was secretary and Miller treasurer, which amount was first erroneously credited to Bliss (not complainant), but was afterwards transferred to the credit of the Lillooet Company; that if the stock purchased by her and Lansing was stock in fact owned by Bliss, then $4,000 of Bliss' money was erroneously credited to the complainant's account.  Other than these she knows of no errors in the deposits to be corrected, and no other reason for this warrant of $7,000 or for any of this class of warrants.

It appears that Bliss was indebted to complainant on August 29th for about $16,000, and the only basis for this indebtedness appearing in evidence is these checks Nos. 1, 2, 5, 6, and 8, issued to him upon these warrants of the second class for like amounts.  If, therefore, the $4,000 paid by Lansing and Mrs. Hamilton to the credit of the Miller account as treasurer in fact belonged to Bliss, as suggested by Mrs. Hamilton, then the aggregate of Bliss' indebtedness to complainant on account of these warrants and checks would be $4,000 less than their total amount, or $16,300.  The stubbook of warrants, defendant's Exhibit No. 44, and the warrants themselves, show that other warrants of the first class were issued to Bliss prior to August 29th for office and other expenses and obligations of complainant to the amount of $252.25 for which no check seems to have been issued by Miller or paid by the bank.  This amount, if not repaid to Bliss, would be a proper offset to that extent against his indebtedness to complainant, and would reduce such indebtedness to $16,047.75.  Mr. Miller says that the indebtedness of Bliss to the complainant on August 29th was $16,077.65, but does not state how the exact amount was ascertained, and it does not definitely appear; that on that day Bliss made a loan for himself from the bank, through Mr. Thomas, its vice president and general manager, for that amount to pay this indebtedness, and for which Bliss gave the bank his individual note secured by separate deeds of his homestead and two farms.  Thomas admits that he made a loan on behalf of the bank for this amount which he placed to the credit of Miller as treasurer, which is the credit item of $16,-077.65 shown in the passbook under date of August 29th, but he says the loan was made to the complainant and not to Bliss individually;

that Bliss a day or two prior to August 29th asked for a loan to himself for about $16,000, but that he (Thomas) refused it on account of Bliss' overdraft in the bank, it then being upwards of $10,000; that after some conversation Bliss finally said the loan was for the complainant, that it contemplated using more money than it had on hand, and if it could obtain the loan it would be repaid in a short time; that he (Thomas) then made the loan to complainant for $16,077.65, and placed that amount to the credit of its treasurer, but at the same time took a check on the bank in the usual form in its favor for the same amount signed "Hawkeye Gold Dredging Co., Lt'd, by B. B. Bliss, Secretary, and H. C. Miller, Treasurer," and the individual note of Bliss for the same amount due on demand as collateral; that the deeds of the farms were accepted as security for the overdraft of Bliss; that that of the homestead was not accepted and was later returned to Bliss. No obligation of complainant for this loan was taken by the bank other than this check signed by Miller and Bliss. The check was not entered upon any of the books of the bank, but the note of Bliss was entered upon the cashbook and in the bills receivable register as a bill receivable. Miller admits that he signed this check of $16,077.65 at the request of Bliss and the cashier of the bank, but says that he told the cashier, who drew the papers, that the check was of no value, and that his name would add none to it. There is considerable testimony in regard to this transaction, some of which cannot be easily reconciled. It would serve no useful purpose to further review it, and it must suffice to say that a careful consideration of the whole thereof leads to the conclusion that Mr. Thomas is in error in his version of this transaction, and that this loan was made by the bank to Bliss individually to enable him to pay his indebtedness of that amount to complainant; that neither Miller nor Bliss was authorized to make a loan for the complainant; that the check signed by them was wholly unauthorized, and neither was ever ratified by complainant; that while Mrs. Hamilton knew that such a check had been made and so informed Mr. Lansing, one of the directors of the complainant, neither they, the president, Miller, nor any other officer of the complainant ever heard the transaction mentioned as a loan to it until Mr. Thomas so testified upon the trial of the law action. The complainant is therefore entitled to retain the credit for this item of $16,077.65, if it is to be charged with these checks Nos. 1, 2, 5, 6, and 8. But should this conclusion be erroneous, and it was found that this loan was in fact to complainant, and is offset by the check of Miller and Bliss for the same amount, the result would be approximately the same, for in that event these checks could not rightly be charged to complainant, for it is not shown that they were given for any obligation of the company, unless it be the obligation to return to Bliss $4,000 of his money erroneously credited to Miller as treasurer, or that it has had the benefit of them in any way whatever. The bank is chargeable with notice that the money deposited to the credit of Miller was in fact complainant's, except it be this $4,000, and could not rightly be applied to the overdraft of Bliss unless so authorized by complainant; and the burden is upon it to show such authority which it has not done. Insurance Co. v. Bank, 104 U. S. 54, 26 L. Ed. 693;

Union Stockyards Bank v. Gillispie, 137 U. S. 411, 11 Sup. Ct. 118, 34 L. Ed. 724; Bayne et al., Trustees, v. United States, 93 U. S. 642, 23 L. Ed. 997; Lamson v. Beard, 94 Fed. 30, 36 C. C. A. 56, 45 L. R. A. 822; Home Savings Bank v. Otterbach (Iowa) 112 N. W. 769; Wheeler v. Home Savings Bank, 188 Ill. 34, 58 N. E. 578, 80 Am. St. Rep. 161; Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268, 17 N. E. 496, 9 Am. St. Rep. 698.

The bank cannot therefore retain credit for these checks unless it be to the extent of $4,000, paid into the account by Lansing and Mrs. Hamilton. This would make the result approximately the same as to omit the transactions of the loan entirely. By so doing the indebtedness of Bliss to complainant might be found to be $16,047.75, as before stated, only $29.90 less than the amount of this loan, a difference that cannot now be traced or located in the wilderness of figures introduced in evidence. But Bliss and the complainant fixed the amount of his indebtedness at $16,077.65 which for the purpose of this hearing will be accepted as correct.

The defendant contends that the failure of complainant to object to the checks entered in and returned with the passbook, and the bringing of the law action to recover the $16,077.65 only, estops complainant from now questioning the correctness of any of the checks other than the one for $16,077.65, and in support of such contention relies upon Leather Manufacturing Bank v. Morgan, 117 U. S. 96, 6 Sup. Ct. 657, 29 L. Ed. 811. What would be a reasonable time in which to make the objection after receiving the canceled checks and passbook would of course depend upon circumstances, and it might well be held under this testimony that none of the directors of the complainant other than Miller and Bliss knew of the reason for making the checks aggregating $20,300 until after the commencement of the law action. But if the rule can be successfully invoked to estop the complainant, it should also estop the defendant from disputing the item of $16,077.65 which it charged to itself in the passbook without taking credit for the check of the same amount signed by Miller and Bliss, which it then held, or in some other manner informing complainant that it held such check against it. But in the view taken of these transactions as above indicated, this contention of defendant becomes immaterial, and it need not be further considered.

The conclusion, therefore, is that on August 29th, when the passbook was made up and balanced, the bank was indebted to complainant as therein shown in the sum of......................$42,234 87
September 16th, there was added to this................   300 00

Making ...........................................$42,534 87
From September 16th to 23d the complainant made 11 checks, which were paid by the bank, aggregating...... 13,327 15

Leaving a balance due complainant of.............. 29,207 72
Of these 11 checks complainant questions only one for $600 to Mrs. Hamilton. But this was drawn and approved by the vice president and secretary of the complainant in the same manner that the other 10 were with one exception, and there is no more reason for not al-

lowing it than there would be for not allowing the others. The defendant is therefore entitled to credit for these 11 checks.

September 24th the complainant made its check for $13,130.07, which was paid by the bank on presentation, thus leaving $16,077.65 due complainant, the exact amount of the loan to Bliss and credited to complainant on August 29th, which defendant seeks to withhold upon the unauthorized check of Miller and Bliss. This for reasons stated it may not do.

The complainant, therefore, is entitled to recover of defendant $16,-077.65, with 6 per cent. interest thereon from September 24, 1904, and costs, and a decree and judgment may be entered accordingly.